JACOB VANDEGRIFT *v.* THE DELAWARE RAILROAD COMPANY; PETER CLEAVER *v.* the same, and ROBERT P. HAYNES *v.* the same.

The jury on a writ of *ad quod damnum* to assess the damages of the owners of lands upon which a railroad is to be located, are to ascertain and determine the pecuniary compensation to which the owners will be entitled for the injury they will sustain by reason of the location and construction of the railroad through their lands; and this is the extent of their authority.

The term damages in this connection, simply means a pecuniary compensation, or recompense for the injuries actually received and should be commensurate with the injury sustained, and nothing more. And in ascertaining the damages, the jury may include, if they see fit, the costs of the fences rendered necessary, as incidental to the taking of the land; but this does not authorize them to make a contract between the parties, or to impose upon the railroad company any obligation, whatever, in respect to the erection of fences along the line of the road. To incorporate such a provision in their return, would therefore be the exercise of powers not granted to them, and such portion of their return will be of no effect.

There is no general law, or statutory provision in this state requiring railroad companies to fence their roads; the general fence law, Revised Code, chapter fifty-seven, has no application to railroads; and where there exists no statutory regulations defining the duties of railroad companies in regard to fencing, they are under no obligation to make, or maintain fences between their roads and the adjoining lands. They come within the common law rule; and at common law, the owner of land is not bound to fence against the cattle of his neighbor. The owner of cattle is bound to keep them within his own lines, and if he suffers them to go at large and they stray upon the premises of his neighbor, they are clearly trespassers, and he is liable for whatever damage they may commit, and as a general rule, he cannot recover for injuries received by them while thus wrongfully on his neighbor's premises.

So too, in regard to railroad companies. at common law they are not bound to fence. Their obligations in this respect, are co-extensive only with statutory requirements; and in the absence of such requirements, no liability, as a general rule, exists for injury to cattle while straying on their tracks, unless they are guilty of wilful negligence, or misconduct

A special agreement, however, made by an agent of a railroad company authorized to make it, with a land owner to erect and keep up good and substantial fences on both sides of their railroad upon his land, will bind the company, although neither the agreement, nor the appointment of

the agent, is under the corporate seal of the company. The ancient rule of the common law on this point, has long been relaxed, if not entirely superseded, both in this country and in England, until at length, corporations in regard to the appointment of agents and making of contracts, are now placed on the same footing as individuals in this country. But in such case, the remedy must be on the contract itself for a breach of it, by the party with whom it is made, or his legal representatives, and not by action of trespass at the suit of a stranger. It does not inure to the benefit of another, such as the tenant of the premises in relation to which it was made ; for such a contract cannot be treated as a covenant running with the land, which it undoubtedly is not.

THESE were three several actions of trespass at the suit of the respective plaintiffs mentioned, against the Delaware Railroad Company, submitted on cases stated to the court and argued together by the counsel who were the same in each of the cases.

In the first case the facts stated and submitted were as follows : Vandegrift the plaintiff, was the owner of a farm in New Castle County through which the Delaware Railroad passes, and became seized thereof by descent on the death of his father, John Vandegrift, in whose life-time the railroad was located upon the land in question, and upon whose appeal taken to the finding of the commissioners appointed under the charter of the company to determine the damages, a writ of *ad quod damnum* was executed and returned by the sheriff of the county, by which return in addition to the money assessed by the jury as damages, they also returned that the said railroad company should make and keep up the fences on both sides of the road passing through the said farm, with sufficient crossings, which said return was confirmed by the court. That a part of the fence on one side of the road passing through the said farm, had been erected by the defendant, the railroad company, but it had refused to put up fences on both sides of the road, or to pay the plaintiff therefor. The question of law arising upon this statement of facts and to be determined by the court, was whether the company was bound to make and keep up the fences on both sides of the road with its crossings on

the plaintiff's said farm? If yea, the amount of the damages in the action to be ascertained by the prothonotary upon proof to be submitted to him of the expenses of making them by the plaintiff.

In the second case, Peter Cleaver, the plaintiff, was the tenant of a farm in said county owned by Jacob Vandegrift, through which the said railroad passes. Similar proceedings were had in this as in the preceding case with regard to the assessment of damages for the right of way, and in which a similar return was made to the writ of *ad quod damnum* as to fences and necessary crossings and confirmed by the court. The company, however, had only put up a part of the required fence on one side of the road on the said farm, and had refused to do any more. The cattle of the plaintiff, to wit, one ox and one heifer had escaped from some of the fields of the farm where they had been pasturing, and strayed upon the railroad for the want of the required fences to exclude them from it, and were run over and killed by a locomotive and train of cars belonging to the Philadelphia, Wilmington and Baltimore Railroad Company, running over the road of the defendants under their authority. The question of law submitted for the decision of the court in this case was, whether the defendants were liable in damages for the cattle of the plaintiff so killed as aforesaid. If the court should be of opinion that they were so liable, judgment to be rendered for the plaintiff for one hundred and ten dollars; otherwise for the defendant.

In the third case, Robert P. Haynes, the plaintiff, was the tenant of a farm in the said county, late the property of Wm. H. Crawford, deceased, and now owned by his heirs at law, under whom the plaintiff held the premises, upon which a portion of the Delaware Railroad had been located under a special written contract between the said Wm. H. Crawford and Andrew C. Gray, agent of the said railroad company, by which it was stipulated and agreed that the company was to pay to Crawford the sum of three thousand three hundred dollars in full compen-

37

sation for the portion of the farm to be taken and occupied by the company for the purposes of the road, and supposed to contain nine acres, and in like proportion for whatever quantity it should be found to contain above that number of acres; said company to make and keep up good and substantial fences on said lands on both sides of the road, and which the said Crawford agreed to accept as full compensation for the use and occupation of the land as aforesaid. But the fences mentioned and referred to in the agreement were not put up by the company; and whilst the plaintiff was tenant of the premises as aforesaid, a young horse of his being in one of the pasture fields of the said farm adjacent to the said railroad, escaped upon it from the said field and was run over and killed by the cars of the Philadelphia, Wilmington and Baltimore Railroad Company running upon the said road of the defendants under a special agreement made between the said two railroad companies under the authority of an act of the General Assembly of this State. The question for the court in this case was, whether the defendants were responsible to the plaintiff in this action for the value of the horse so killed and destroyed?

*Rodney*, for the plaintiffs : The question was whether on the award and finding of the jury on the writs of *ad quod damnum* in the first two cases stated, the railroad company was bound to make and keep up the fences on both sides of their road upon the premises of the plaintiffs. It was contended by the company that they were not so bound, because their charter did not require it; but, if by the general statute in regard to fences, or by the charter of the company, by the common law, or by the award of the jury, they were bound to erect and maintain them, then the judgment of the court ought to be for the plaintiffs. He put the liability directly on the award and finding of the jury upon the inquisitions under the writs of *ad quod damnum*. It might be said that the jury exceeded their authority and went beyond the line

of their duty in requiring the company to do more than to pay the damages assessed in money. But his reply to that was, the company became bound by it, by acting under it and accepting the land condemned for the right of way under the proceeding according to the terms of the finding. Besides, in separating the money damages from the requirement of keeping up the fences, the jury did no more than what was equivalent in effect to the assessment of the whole in pecuniary damages. Had it suited the purposes of the company to make this objection when these condemnations were made, they could have moved to set aside, or quash these proceedings on the return of the writs, on the ground that the jury had transcended the power conferred upon them for the purposes of the condemnation, and the informal execution of the inquiry; that the company was legally bound to raise the objection then, and not to waive it as they had done, and to claim and obtain the use and occupation of the land condemned, at less than the actual damages assessed, and afterward to insist that the jury had exceeded their authority in this particular, and they were therefore not bound to make, or keep up any more of the required fences than suited their pleasure, or convenience. The jury, instead of making this special requisition, might have included the expenses of making and maintaining the fences along the road on the lands in question, in the amount of the pecuniary damages assessed; but it was competent for them under the power delegated to them, to separate them as they had done, and it was beneficial for the company, as well as the landholders, that they had done so ; and it was now too late, after having acquiesced in their finding and accepted and occupied the lands pursuant to the terms of it, for the company to raise this objection. In the absence of any such return as this, or if the assessment had simply been in money damages, without any condition or qualification as to the fences and crossings, the company would have been bound to put and keep them up, as a general duty incumbent by law

upon it. *Pierce on Amer. R. R. Law*, 321, 346. 23 *Verm. Rep.* 387. Commissioners to assess damages in such cases, have the power to impose the duty of making and keeping up the fences along the road over the lands condemned, upon the company; or it may be arranged by special agreement between the parties, the landholder and the company. *Pierce on Amer. R. R. Law*, 351.

*James A. Bayard,* for defendant: All the cases involve and present one question. As to the proceedings of the commissioners, the question was what was submitted to them and to the inquisitors under the writs of *ad quod damnum?* For they were limited and confined to their legitimate powers. Where referees acted beyond the scope of their authority, the excess was void, but the rest of their award might be good. 1 *Amer. R. R. Cases* 199. In this case we were to look to the statute, and to that alone, for the authority of the commissioners, and of the juries under the writs of *ad quod damnum.* By the terms of the statute, or charter, the writs were not subject to the supervision of the court; on the contrary, the awards, or inquisitions under it, were to be certified to the parties, and the finding of the jury was final. There was nothing in the statute rendering it necessary to return either to the court; and by it, the court had nothing to do with either of them. There was no obligation on the company by the charter, or any law, to fence the road, and there was nothing in the cases stated alleging such a liability. The company was not the owner of the land; it had only the right of way over the part condemned. If it were the owner of the land, it would be liable in this respect, as other landholders, under the general statute, and might be compelled, pursuant to the provisions of it, either to erect and keep up, or to reimburse the expenses of erecting and keeping up the division fences along the lines of their road, as other adjoining land-owners would be; but even in that case, they would only be liable for one-half of the expenses, mutually with

the adjoining land-owners. But this general liability of land-owners to fence, does not apply to railroad companies; for they were not bound to fence their railroads. 1 *Amer. R. R. Cases*, 212. *Redfield on Railways* 368, 374.

In the second case stated, Cleaver, the plaintiff, was not the owner, but only a tenant of the premises in question, and the same was the case with Haynes, the plaintiff, in the last case stated; and for this reason, neither of them was entitled to recover, or could maintain an action on the grounds alleged, for there was nothing submitted to the commissioners, or the jury of inquisitors under the charter with regard to them, or either of them. But would the court go still further than the counsel on the other side and say that the jury could establish by the finding a covenant real in the cases to run with the premises in question, and embrace among the privies to it, every tenant who might hereafter come into the possession and enjoyment of them? It could not be so construed, or considered, for neither Cleaver, nor Haynes ever had any privity in these proceedings, and never could have any. 1 *Amer. R. R. Cases* 456. 2 *Cush.* 536.

In the case of Haynes, which was the third case submitted, there was an agreement by Mr. Gray with Mr. Crawford, since deceased, and then the owner of the lands in question. But it was not an agreement under seal and therefore it was no covenant, and there could be no ground for alleging it to be such. The defendant, however, was relieved of all difficulty in the case on the score of that agreement, for it was an agreement made by one who represented himself to be an agent of the company for the purpose; but if he was such, and the agreement was binding on the company, then the plaintiff's remedy, if he had any remedy at all in the case, which he denied, was on the agreement, the contract itself, and not in the present form of action, which was in trespass for killing his horse.

The horse and cattle destroyed were killed according to the cases stated, by a train of cars belonging to another

company, the Philadelphia, Wilmington and Baltimore
Railroad Company running over the Delaware Railroad
with the consent and authority and by agreement with
the defendant; and if so, the latter could not be liable
for their destruction; but the actions and redress of the
plaintiffs for the damages sustained, if they had any,
should have been against the other company, whose
servants and agents in the course of their employment
killed them. Railroad companies were held in law to
the same liabilities as other owners of land, and to no
other, either greater, or less.

*Rodney*, in reply: As to the character in which the
plaintiffs sued in these actions and the circumstances under
which the Delaware Railroad Company is sued by them,
the principle of law is that the owners of the road on
which the damage occurs, are liable for the injuries sus-
tained to persons and property; and in cases like these,
the tenants of the land may maintain the action, and the
owners of the road were liable for the damages. *Pierce on
R. R. Law* 356. 16 *Barb.* 315. 26 *Vermt.* 717. *Pierce on R.
R. Law* 244, 245. In the case cited on the other side
from Amer. Railway Cases, the tenants failed to main-
tain their actions, not because they had no right as such
to sue, but because the agreement on which the action
was founded, was by parol merely. . If the railroad com-
pany owned the lands in question over which their road
is laid in absolute fee, they would be bound as adjacent
owners to construct the required fences as division fences,
or to contribute their mutual half of the expense of
erecting and maintaining them. But such was not the
case; and their property in the land being an exclusive
right of way over it only, or a mere easement, it was that
which took the cases out of the operation of the principle
of law referred to and relied upon on the other side. The
necessity for fences along the lines of the road, were a
part of the damages and detriment to the property in the
land, consequent upon laying the road through the farm,

as much so indeed, as the appropriation and occupation of the land itself for the purposes of the road by the company, and it was so admitted to be in the argument on behalf of the defendants.   It was an inseparable incident to the appropriation and occupation of the land condemned for the uses of the company, when the road was projected and laid through cultivated fields and highly improved farms, such as these were.   If then the necessity of these fences were to be considered as a part of the inherent damages to the land-owner, consequent upon laying out the road through his premises, the award and finding of the jury could not be received in part and rejected as to the residue, that is to say, it could not be adopted as to the mere formal assessment of the damages in money, and repudiated as to the obligation and requirement on the part of the company to fence.   As to the authority of Mr. Gray, as the agent of the company to make the contract with Mr. Crawford, as set forth in the last case, all he should have to say was that it was totally immaterial whether he had such authority, or not, at the time of making the agreement, as the company afterward accepted the land covered by it, and took possession of it by virtue of the agreement, and by so doing, ratified and confirmed it and was now bound by it.

*Gilpin, Ch. J.*, announced the opinion of the court. These several cases came on for hearing at the last term of this court; and as they were argued together, I propose to deliver but a single opinion, disposing of all the questions presented in the argument which it is deemed material to decide.   The principles enunciated, may, without difficulty, be applied to the facts of each particular case.

The second section of the supplement to the act incorporating the Delaware Railroad Company, of the 24th of February, 1853, after naming the commissioners to assess the damages of the owners of the lands, upon which the railroad may be located, and directing them to pro-

ceed in all respects, as if they had been appointed under the fourteenth section of the charter, passed on the twenty-second of February, 1849, provides that if either party shall be dissatisfied with the damages assessed, he may at any time within thirty days after such assessment, sue out a writ of *ad quod damnum*, requiring the sheriff, in the usual form, to inquire by twelve impartial men of his bailiwick, of the damages aforesaid, and that their report shall be final.

The commissioners in one case, and the jury under the writ in the other, are to exercise the powers and perform the duties, devolved upon them respectively, under the provisions of the fourteenth section of the charter. These powers and duties are of specific and definite character. The jury are clothed with the same authority, which, in the first instance, is conferred on the commissioners, and no more; and the extent, or limit, of this authority, is to be ascertained from the terms of the fourteenth section.

Now, what are they authorized and directed to do? They are to assess the damages of the owners of lands upon which the railroad may be located; that is, they are to ascertain and determine the pecuniary compensation to which the owners are entitled, for the injury which they have sustained, by reason of the location and construction of the railroad through their lands. This is the extent of their authority.

The word damages, in this connection, is not of difficult interpretation; it has a well ascertained legal signification. It simply means a pecuniary compensation or recompense to the plaintiffs for injuries actually received by them from the defendants. The damages assessed should be commensurate with the injury sustained, and nothing more. And on ascertaining them, the jury might, in these cases, have included, if they had seen fit, the costs of the fences, as incidental to the taking of the land; but there is nothing in the charter authorizing them to make a contract between the parties, or to impose upon

the railroad company, any obligation whatever, in respect to the erection of fences, along the line of the road. We are therefore of the opinion, that in undertaking to do so, by incorporating in their return, a provision that the railroad company shall make and keep up all fencing on both sides of the road, they assumed to exercise powers not granted to them, and that this portion of their return is of no effect.

The next question is, whether, under the general law, the defendants were bound to erect and maintain fences? We think not. We know of no general statutory provision in this State, requiring railroad companies to fence their roads. We do not consider the fence law, as contained in chapter fifty-seven of the Revised Code, as at all applicable to railroads. And it seems to us, to be well settled by a series of well considered decisions, both in this Country and in England, that where there exists no statutory regulations defining the duties of railroad companies in respect to fencing, they are under no obligation to make or maintain fences, between their road and the adjoining lands. They come within the common law rule; and at common law, the owner of land is not obliged to fence against the cattle of his neighbor. The owner of cattle is bound to keep them within his own lines, and if he suffers them to go at large, and they stray upon the premises of his neighbor, they are clearly trespassers, and he is liable for whatever damage they may commit; and as a general rule, he cannot recover for injuries received by them, while thus wrongfully on his neighbor's premises. So too, in regard to railroad companies; at common law, they are not bound to fence. Their obligations in this respect, are only co-extensive with statutory requirements; and in the absence of such requirements, no liability, as a general rule, exists for injury to cattle while straying on the track. They have a right to the unobstructed enjoyment of the right of way; they have a right to run their cars over the road, without let or hinderance, and cattle, straying upon the road, are

38

regarded by the law, as being there wrongfully, as trespassers; and they are not liable for the destruction of cattle so being there, unless they are guilty of wilful negligence or misconduct. But in the cases now under consideration, no negligence, whatever, is alleged against the company.

The case of Robert P. Haynes differs materially from the other cases, in the fact that there was a contract on the part of the defendants to make and keep up good and substantial fences, on each side of the road. This contract purports to have been made on behalf of the defendants by Andrew C. Gray, with William H. Crawford, the then owner of the land. It is in writing, but not under seal. And, a doubt has been suggested in the course of the argument, whether the agreement as set out in the case stated, is sufficient to bind the railroad company. The authority of Mr. Gray to act as the agent of the defendants, is not stated; but we think that the agreement being made by the parties, a part of the case stated, amounts to an implied recognition on the part of the defendants of his authority to act as their agent. Assuming then that he was authorized to contract on their behalf, the question is presented as to the legal effect of the contract, as between the parties to this suit.

The ancient rule, at common law, in respect to corporations aggregate, unquestionably was, that they could contract only by deed, that is, under their corporate seal. But in this country, where corporations of this character have been created and multiplied by the legislatures of the several states, for almost every conceivable purpose, the old rule, on account of its practical inconvenience and injustice, has become greatly relaxed. Indeed, the exigencies and interests of the business community have been such as to require this to be done; and as a consequence, the current of modern decisions has been such as gradually to change the ancient rule, until at length, corporations are, in regard to the appointment of agents and the making of contracts, placed on the same footing with

individuals. So too, has the rule been relaxed in England, though perhaps, not to the same extent. The contract, therefore, we consider a binding contract, between the parties who made it. But the remedy must be had on the contract itself, for a breach of it, at the instance of the party with whom and for whose benefit it was made, or his personal representatives, and not by action of trespass at the suit of a stranger. It does not enure to the benefit of the plaintiff, Haynes, as tenant of the land. To take any other view of the question, would be to treat the contract as a covenant running with the land, which it undoubtedly is not. *Morse v. The Boston and Maine R. R. Company,* 2 *Cush.* 536.

The plaintiff's counsel seems to rely mainly, on the New York and Vermont cases of *Rensselaer and Saratoga R. R.,* 4 *Paige* 553, *and Quimby v. Vermont Central R. R. Co.,* 23 *Vermont* 387, as sustaining the doctrine he contends for. These cases, however, are in direct conflict with the settled rule of the common law, and with the general course of decisions in other states. The New York case does not appear to have been followed even in that state; in fact, it is in conflict with subsequent decisions there, as well as elsewhere.

The decision in the Vermont case, is, to say the least of it, anomalous in its character. It looks more like a case of judicial legislation, than the application of any recognized principle of the common law. As to statutory rules or requirements, there was none. But it does not seem to have settled the law even in Vermont; at least, there is a want of uniformity in their decisions on the question, as may be seen by reference to the subsequent case of *Hurd v. Rutl. and Burl. R. R. Co.,* 25 *Vermt.* 123, in which it is laid down that where no statute exists, and no obligation is imposed by covenant or prescription, a railroad company is not bound to fence their lands.

Let judgment, therefore, be entered in each of these cases for the defendants.